## ED KINZER v. STATE.

No. A-2987.   Opinion Filed November 30, 1918.

(176 Pac. 92.)

1. **LARCENY—Corpus Delicti—Sufficiency of Evidence.** Evidence examined, and **held** sufficient to establish the corpus delicti of the crime of grand larceny.

2. **APPEAL AND ERROR—Evidence—Voluntary Confessions—Burden of Proof—Burden of Establishing Error.** Voluntary confessions made by the defendant are admissible in evidence. Where confessions of defendant are admitted in evidence, the burden is upon the appellant in this court to show affirmatively that any such confession was obtained by compulsion or duress, and in such a manner as to violate the defendant's constitutional privilege against self-incrimination. Where there is a conflict between the evidence for the state and that for the defendant as to whether or not a confession was voluntarily made, and the trial court admits evidence of such confession without objection or exception thereto, the burden upon appellant of affirmatively establishing error is not sustained.

*Appeal from District Court, Okmulgee County;*
*Ernest B. Hughes, Judge.*

Ed Kinzer was convicted of the crime of grand larceny, and he appeals.   Affirmed.

*Joe S. Eaton,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J.   This is an appeal from the district court of Okmulgee county; the defendant having been convicted in that court of the crime of grand larceny, and his punishment fixed at imprisonment in the state penitentiary for a period of one year.

The contention is here urged that there is no competent and legal evidence tending to establish the *corpus*

*delicti* of the offense. In this connection it is claimed that the conviction was based largely upon purported extrajudicial confessions of guilt made by the defendant, which said confessions are not sufficiently corroborated by proof *aliunde* of the *corpus delicti*.

The defendant was charged with the larceny of 700 feet of 2¼-inch manila cable, of the value of $90, of the personal property of "Reynolds & Burns," a copartnership composed of C. E. Reynolds and J. R. Burns. The taking of the same is alleged to have been on or about the 5th day of May, 1915.

C. E. Reynolds, one of the partners doing business under the firm name of "Reynolds & Burns," testified that such firm was engaged in drilling oil wells, and had immediately prior to the 5th day of May been engaged in drilling an oil well on the farm of Lee Morgan, located on the S. W. ¼ of the S. W. ¼ of section 17, township 14 N., range 15 E., in Okmulgee county, Okla., and had completed said well a short time before the 5th day of May, 1915, and among other property left near said completed well was a quantity of manila drilling cable; that about 700 feet of 2¼-inch manila cable disappeared without the knowledge or consent of the firm; that thereafter the witness went to the junk yard of Abe Ball in the city of Okmulgee, and discovered some cable of the same kind lost by his firm in a pile of junk at said junk dealers, the cable having been cut up into lengths of about three feet each. The witness could not positively identify the cable as that lost by him, but identified it as the same kind and make of cable, and testified that it was worth about $100.

On cross-examination the witness testified that, when he went to Ball's junk yard, he found in the neighborhood of a carload of cable, some of it of the same make that was

lost by his firm; that he could not undertake to identify the cable, other than that it was the same kind as lost by him.

Orvel Thompson, the sheriff of Okmulgee county, testified that he arrested the defendant, Kinzer, something like two weeks after the cable had been reported stolen; that he had a talk with the defendant about the cable that had been stolen from Reynolds & Burns' well, after the defendant was arrested, in the sheriff's office; that the defendant first denied that he took the cable, but afterwards owned up to it; that defendant said that he went north of Lee Morgan's house and got some cable, and then came back and went east and got some east of the house; that it was stolen in the nighttime, and that Claud Gorman and some other fellow was with him; that they went there in a wagon, driving defendant's father's team, and brought the cable to Okmulgee and sold it to Abe Ball.

On cross-examination the witness testified that he asked defendant questions, and that the admissions made by defendant were in answer to questions propounded by the witness; that, before the defendant confessed to having taken the cable, the witness confronted him with Claud Gorman, who was at that time confined in the county jail. The witness also testified that he did not remember whether or not he called the defendant a liar before he confessed to having been implicated in the larceny of the cable.

The witness also testified that, shortly after the defendant confessed his connection with the larceny, he was taken over to the justice of the peace court of one Shields for arraignment and examination; that, when the said justice of the peace arraigned the defendant, he said, "Well, I just as well plead guilty; I am guilty;" that thereafter the father of the defendant and some attorney appeared in

the justice court, and the plea of guilty was withdrawn, and a plea of not guilty entered, and a change of venue taken from such justice of the peace to the justice court of one Russell, where a preliminary examination was afterwards had.

H. B. Reed, another witness, testified that he was a constable in Okmulgee county, and that he was present in the justice of the peace court of Shields when the defendant was arraigned and pleaded guilty to the charge.

C. J. Shields, the justice of the peace, testified that the defendant was arraigned in his court on the charge of stealing this particular cable, and that he had pleaded guilty thereto after having been apprised of his constitutional rights, and told that he was charged with a felony, but that shortly thereafter the father of the defendant appeared with an attorney, and the plea of guilty was withdrawn, and a change of venue taken to Mr. Russell's justice of the peace court, and that the witness made no record in his docket of anything that occurred before him.

Sadie Ball testified that she was the daughter of Abe Ball, and knew the defendant, Ed Kinzer; that she had seen him several times when he brought junk to her father's junk yard; that he had brought cable there about three different times; that he brought some there cut in three-foot pieces; that the defendant came there on or about the 5th day of May, 1915, and brought some cable, which was cut up into pieces; that it was good cable, and could have been used as cable, had it not been cut up in small pieces; that there was another man with the defendant, that she took to be his brother; that witness bought the cable from the defendant, and paid him by check given by her mother for $20.50, which check witness identified, and the same was introduced in evidence, dated May 5,

1915, and payable to the order of J. P. Kinzer, for $20.50, signed by Y. Ball, and bearing the indorsement of J. P. Kinzer on the back thereof, and paid by the Citizens' National Bank of Okmulgee on the 5th day of May, 1915.

This witness positively identified the defendant as the person to whom the check was given, and who brought the cable to the junk yard, and stated that the defendant told her to make the check payable to J. P. Kinzer.

On cross-examination, the witness testified that the defendant had brought cable there before the 5th of May, 1915, she thought on several different occasions, but she could not remember the exact dates; that he had been there as often as three or four times a week, would then quit a while, and then come again with cable; that somebody was with him each time he came there; that defendant said that such person was his brother; that parties were paid by check when cable was brought there, and witness remembered that one check was made to Will Kinzer; that defendant was along when that check was given.

Witness also testified that defendant was paid at the rate of $1.50 a hundred for the cable; that, when defendant brought the cable there, it had been weighed at Carey's scales, and defendant brought the ticket with him; that defendant was paid according to such weight.

The defense interposed was an alibi; several relatives of the defendant testifying that the defendant was at the residence of one of his uncles, Wagoner county, on a farm about seven miles north of the town of Haskell, in said county, from about the 5th day of May, 1915, to and including the 15th day of May of said year.

The evidence of the defendant's witnesses as to the particular day on which he arrived in Wagoner county was

somewhat contradictory; some witnesses testifying that he was there on the 5th day of May, while others place his appearance in that community as late as the 15th day of May. Two witnesses for the defendant testified that his general reputation for honesty and fair dealing was good.

The defendant took the witness stand in his own behalf, and testified that he left home on the 4th day of May, 1915, and was at his uncle's home in Wagoner county on the 5th day of May, arriving there between 12 and 1 o'clock on said day, and that he stayed on his uncle's farm from that time up until the 16th day of May, 1915, when he returned home and was afterwards arrested, charged with this crime.

The defendant also testified as follows:

"Q. I wish you would just tell the jury whether you ever hauled any rope down here, and where you got it, and about when it was. A. I did. I hauled one load of rope in; I don't remember the date. I hauled the rope for Claud Gorman and another fellow; they told me they would give me $3 for bringing it in for them; there was 900 pounds of it, and I got a dollar a hundred; they gave me $3 for bringing it in for them. I don't know how they managed their part of it, nor nothing about it; they just gave me $3. I don't know whether they stole the rope, or how they got the rope.

"Q. Tell the jury all the facts, how you came to get the rope, and all about it. A. I met Claud Gorman about 2 o'clock one evening, and he was telling me about this fellow had some rope over there, and I was hauling ice out of Okmulgee at the time; he knowed it, and he said this fellow wanted to get somebody with a team to haul the rope in for him, and he told me it was on Lee Gorman's place. I don't know what section it is, but we went over to get the rope about sundown, hardly sundown when we drove in there, and we brought it into Okmulgee the next day.

"Q. And took it down? A. Yes, sir.

"Q. Where did you weigh the rope? A. At the elevator, across the railroad track.

"Q. Is that Mr. Carey's place? A. I don't know whose place.

"Q. That is the place, just across from the depot? A. Yes, sir.

"Q. Where was this rope when you got it? What was its condition? A. This rope, when I seen it, was in three pieces and scattered out.

"Q. It was how? A. It was in three different pieces; it was laying there with a whole lot of mud over it; it had been overflowed, and there was mud on it.

"Q. Do you mean three piles of it? A. Well, three places, yes; it was all around the same well, but it was in three different pieces; three different parts of it.

"Q. You mean there was just three parts of the rope? A. Yes, sir; three pieces of the rope; it was in three different places.

"Q. How long was the rope? A. Well, I don't know how long the rope was; I don't know nothing about the rope myself; I don't know how it measures, but there was 900 pounds of the rope.

"Q. When you got there, was it cut up in pieces, and how long were the pieces? A. I don't know; those great long pieces we just coiled them up in the wagon; the three pieces altogether weighed 900 pounds.

"Q. How was this rope out there at that time? Was it all in one place, or what was the condition? A. The well had been drilled, and they had moved—carried the stuff away from there; but this rope is all I seen; there wasn't no other tools around there as I noticed.

"Q. I hand you that check, and ask you if you ever saw that before? (handing witness State's Exhibit A.) A. I did not.

"Q. State whether or not that is your signature on the back of it.    A. It is not my signature.

"Q. Whether you signed that, or is that your writing? A. No, sir; it is not.

"Q. Is that your name?    A. No, sir.

"Q. Whose name is that?    A. That is my brother's name.

"Q. Where is your brother?    A. I couldn't tell you where he is.

"Q. Where did he live at that time?    A. Well, he lived at Haskell.

"Q. Now, did you ever receive that check from Sadie Ball, or any one else, and cash it?    A. No, sir; I never received a check from Sadie Ball at no time.

"Q. Did you plead guilty over here in Shields' court? A. No, sir; I didn't.

"Q. Just tell the jury what you did.    A. Well, sir, I was down there in Mr. Thompson's office, and he asked me questions, and I would make an answer, and he would call me a damn liar; and every time I would make an answer, when he would ask a question, he would call me a damn liar; and he taken me over to Shields' court, taken me in there, and he says, 'Are you guilty or not guilty?' and I says, 'It seems like you are trying to make me guilty.' That is all I said to him; I didn't even say 'Yes, sir' or "No.' "

On cross-examination the defendant testified in part as follows: ·

"Q. And you didn't tell Mr. Shields that you were guilty?    A. I told him I hauled a load of rope in here, which I did; I hauled that rope in here for Claud Gorman and this other fellow; they gave me $3.

"Q. Do you say you didn't tell him you were guilty? A. No, sir; I didn't tell him I was guilty; he asked me if I

stole the rope; that is what Mr. Thompson ask me, and I told him I didn't.

"Q. Didn't Mr. Shields ask you or tell you that you were charged with grand larceny and that was a felony? A. Yes, sir.

"Q. And he asked you if you were guilty or not guilty? A. Yes, sir.

"Q. What did you answer? A. I didn't say 'Yes' or 'No'; I says, 'It seems like you fellows are trying to make me guilty anyway.'

"Q. Now, didn't you say, 'It seems like they are trying to make me guilty?' A. I could have said it that way; that was when Mr. Eaton asked me the question, I said that; yes, sir.

"Q. As a matter of fact, you told Mr. Shields you were guilty? A. No, sir.

"Q. And you are trying to squirm out of it now? A. No, sir; I didn't tell him I was guilty.

"Q. When was it you brought that rope in here? A. Well, sir, I don't remember the date.

"Q. Who paid you for it? A. Mr. Ball wrote out the check; he didn't write no check to me at all; I never received no check for anything like that in this town, nor any other town.

"Q. Who went to this place with you, with particular load of rope you hauled? A. Claud Gorman, and this other fellow with him; I don't remember his name.

"Q. You don't remember his name? A. No, sir.

"Q. And never have seen him since? A. No, sir.

"Q. How long after you brought that rope in here until you were arrested? A. About two weeks, something like that; I don't remember exactly, something near two weeks.

"Q. Have you ever inquired of Claud Gorman who that other fellow was? A. Claud Gorman don't know himself, so he testified in his preliminary hearing.

"Q. Have you ever tried to find out who that other fellow was? A. No, sir.

"Q. You have never asked a living soul? A. No, sir.

"Q. Nor where he lives? A. No. sir.

"Q. You made no effort to find out? A. No, sir.

"Q. And have no idea who he is and where? A. No, sir.

"Q. What kind of a looking man was he? A. Well, sir, he was a black-mustached fellow.

"Q. You say you know where you were on the 5th of May? A. Sir?

"Q. You say you know where you were on the 5th of May? A. Yes, sir; I do, indeed.

"Q. What day was it that you brought that load of rope in here? A. I don't remember the day.

"Q. You don't? A. No, sir.

"Q. Who was that check made payable to, the load you brought in here? A. It was made to the other fellow, that one I have never seen since or before.

"Q. Did you see the check? A. No, sir; I did not.

"Q. Where were you when it was written out? A. I was right out there in the wagon.

"Q. In the wagon? A. Yes, sir; right out in front of the office there at Ball's livery barn.

"Q. Did you go with the man up to the bank to get the check cashed? A. No. sir; I didn't.

"Q. Where did you and he separate? A. We separated right down there.

"Q. Right at the junk yard? A. Yes, sir; and I went and got my load of ice and went home.

"Q. He didn't come up in town with you? A. No, sir.

"Q. What kind of a looking man was he? A. Black-mustached fellow.

"Q. Black mustache? A. Yes, sir; slim fellow.

"Q. Was he as tall as you are? A. Yes, sir; hardly as heavy.

"Q. About your height? A. Yes, sir.

"Q. How old? A. He looked to be about 35 or 40, maybe older.

"Q. How was he dressed? A. I disremember his clothes.

"Q. But you do remember he has black mustache? A. Yes, sir; I remember he has black mustache.

"Q. He didn't tell you what his name was? A. No, sir.

"Q. You never had seen him before? A. No, sir."

The foregoing substantially states both the state's and the defendant's theory of this case. It is clearly established that certain manila cable was stolen by somebody from the farm of Lee Morgan in Okmulgee county, Okla., on or about the 5th day of May, 1915, and that about the amount of cable so stolen and answering the description of the stolen cable was found in the possession of one Abe Ball, a junk dealer in the city of Okmulgee, said county, very shortly after it was taken from the premises of Lee Morgan, where the firm of "Reynolds & Burns" had left it after having completed the drilling of an oil well on said premises.

Independent of any confession made by the defendant, the state's evidence tends to show that the defendant hauled an amount of cable answering the description of that lost by "Reynolds & Burns," and also about the amount lost, to Abe Ball's junk yard, where the same was sold by him after having been cut into small lengths, as junk for the price of $1.50 a hundred pounds; the whole amount totaling at that price the sum of $20.50. It is clear, also, that in the form of regular cable, for drilling purposes, the amount sold by the defendant would have been worth four or five times what he received for it.

In this connection it is to be noted, also, that the defendant admits that he hauled certain cable to Abe Ball's junk yard for one Claud Gorman and a total stranger, for which hauling he received the sum of $3; but he denies it was the particular cable stolen, but his memory as to the date he hauled the cable to Ball's is deficient, and the fact that he admits his connection with such a transaction, although denying guilt of the particular transaction charged, tends clearly to weaken the defense of alibi interposed by him.

The witnesses introduced by defendant to establish an alibi contradict each other as to the particular date that the defendant appeared at his uncle's farm in Wagoner county; some witnesses placing it as the 5th day of May, 1915, while others swear just as positively that it was the 15th day of May, 1915. These contradictions could hardly be reconciled by the jury, so as to permit the conclusion that the defendant was at a place other than the scene of the crime on the day of its commission.

The check given in payment for the cable sold to Ball was dated the 5th day of May, 1915, and was cashed on said date. It was made payable to J. P. Kinzer, and the

defendant testified that he had a brother with the initials "J. P.," but that he did not know the whereabouts of said brother.

The testimony of Sadie Ball clearly connects the defendant with the sale of the cable. The defendant was not a stranger to her, having had dealings with her on former occasions, and she testified that he told her to make the check payable to J. P. Kinzer. While there is conflict between the testimony of the defendant and that of Sadie Ball, connecting him with the sale of the cable on the 5th day of May, 1915, such conflict was for the jury to settle, and it is the opinion of this court that the evidence adduced by the state, when considered in connection with the extrajudicial confessions made by the defendant, sufficiently establishes the *corpus delicti* of this offense, and is sufficient to sustain the conviction.

Counsel for plaintiff in error strenuously contend that the alleged confessions of the defendant were obtained by threats and compulsion, and were improperly admitted. We find no objection to their admission in the record, nor was any exception taken at any time to the court's action in permitting testimony relative thereto. The jury considered both the evidence of the state's witnesses relative to the circumstances under which the defendant confessed, and also heard what the defendant had to say about it. Under the ruling of this court in the case of *Berry et al. v. State*, 4 Okla. Cr. 202, 111 Pac. 676, 31 L. R. A. (N. S.) 849, these alleged confessions were properly submitted to the jury.

Neither is there any merit in the contention that the confession alleged to have been made before the justice of the peace was treated as a judicial confession. We have searched the record carefully, and are unable to find

wherein said confession was so treated by the trial court; in fact, the court's instructions clearly indicate that these alleged confessions were treated as extrajudicial confessions, and the jury was told that the defendant could not be convicted upon statements acknowledging his guilt un-less the same were corroborated by other testimony.

While no complaint is made of the court's instructions, we have carefully examined the same, and find them to be fair and impartial in every respect, fully covering the law of the case. No request was made of the court for other instructions than those given, and, after a careful examination of the record, it is the opinion of this court that the defendant is guilty of the crime charged, and he received a fair and impartial trial, and that the punishment assessed is merited by the evidence.

The judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.